## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### HUNTINGTON DIVISION

**REUBEN LANE DEBOARD,**

      **Plaintiff,**

**v.**                                                    **Case No.: 3:16-cv-02661**

**CAROLYN W. COLVIN,**
**Acting Commissioner of the**
**Social Security Administration,**

      **Defendant.**

### PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Brief in Support of Judgment on the Pleadings and the Commissioner's Brief in Support of Defendant's Decision, requesting judgment in her favor. (ECF Nos. 12, 13).

Having fully considered the record and the arguments of the parties, the undersigned United States Magistrate Judge respectfully **RECOMMENDS** that Plaintiff's request for judgment on the pleadings be **DENIED**, the Commissioner's

request for judgment on the pleadings be **GRANTED**, the Commissioner's decision be **AFFIRMED,** and that this case be **DISMISSED** and removed from the docket of the Court.

## I.     Procedural History

On January 7, 2014, Plaintiff Reuben Lane DeBoard ("Claimant"), completed applications for DIB and SSI, alleging a disability onset date of August 1, 2012, (Tr. at 294, 299), due to "bad feet, depression, bipolar [and] high blood pressure." (Tr. at 373). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 214, 227). Claimant filed a request for an administrative hearing, which was held on March 20, 2015 before the Honorable Chris Gavras, Administrative Law Judge ("ALJ"). (Tr. at 122-165). By written decision dated May 13, 2015, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 109-117). The ALJ's decision became the final decision of the Commissioner on January 28, 2016, when the Appeals Council denied Claimant's request for review. (Tr. at 1-4).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of Proceedings. (ECF Nos. 8, 9). Claimant then filed a Brief in Support of Judgment on the Pleadings. (ECF No. 12). In response, the Commissioner filed a Brief in Support of Defendant's Decision. (ECF No. 13). Consequently, the matter is fully briefed and ready for resolution.

## II.     Claimant's Background

Claimant was 56 years old at the time of the alleged onset of disability and 59 years old at the time of the ALJ's decision. (Tr. at 109, 129). He has a Bachelor's Degree and a Master's Degree, and he communicates in English. (Tr. at 129, 372). Claimant previously

worked as a case manager/counselor for a mental health facility, social service director for nursing facilities, and an in-home therapist for at-risk children. (Tr. at 130-136, 161).

## III.   **Summary of ALJ's Decision**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this

determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. §§ 404.1520a(a), 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). If an impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in *Id.* §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes

4

of decompensation of extended duration) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental functional capacity. *Id.* §§ 404.1520a(d)(3), 416.920a(d)(3). The regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2018. (Tr. at 111, Finding No. 1). At the first step of the sequential evaluation, the ALJ found that Claimant could not establish a 12-month period in which he had not engaged in substantial gainful activity until October 1, 2013. (Tr. at 111-12 at Nos. 2 and 3). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "marked hallux deformity with severe degenerative changes and calcaneal spurs bilaterally." (Tr. at 112-114, Finding No. 4). Under the third inquiry, the ALJ found that Claimant did not

have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 114, Finding No. 5). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform the full range of sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a).

(Tr. at 114-116, Finding No. 6). At the fourth step, with the assistance of a vocational expert ("VE"), the ALJ determined that Claimant was able to perform past relevant work as an in-home therapist. (Tr. at 117, Finding No. 7). Therefore, the ALJ found that Claimant was not disabled as defined in the Social Security Act, and was not entitled to benefits. (Tr. at 117, Finding No. 8).

## IV. Claimant's Challenge to the Commissioner's Decision

Claimant presents numerous challenges to the Commissioner's decision. Specifically, Claimant argues that the ALJ failed to (1) properly consider his pain and perform a valid credibility determination; (2) consider the combined effect of his impairments, including depression, anxiety, and leg and foot pain; (3) develop the evidence regarding the effect of his depression on his activities of daily living and ability to work; and (4) produce evidence sufficient to rebut the presumption of disability. (ECF No. 12 at 5-9).

In response to Claimant's arguments, the Commissioner contends that the substantial evidence standard of review is highly deferential to the Commissioner's decision and, in this case, the ALJ evaluated Claimant's subjective statements of pain in accordance with the regulations, reasonably evaluated the combined effects of his impairments, and adequately developed the record. (ECF No. 13 at 4-10).

## V.   **Relevant Medical Evidence**

The undersigned has considered the medical evidence of record, including the records of Claimant's health care examinations and treatment, all of which occurred at Veterans' Administration ("VA") medical facilities, and consultative evaluations prepared by state agency experts that reviewed Claimant's medical records. The medical information most relevant to Claimant's challenges is summarized as follows.

### A. *Treatment Records*

On June 29, 2012, Claimant established primary care at the VA Medical Center in Huntington, West Virginia, after moving from Indiana. (Tr. at 792). Claimant complained of depression and painful bunions in both feet for which he wanted to explore corrective surgery. (Tr. at 792-93). A week later, on July 6, 2012, Claimant had a mental health core assessment. (Tr. at 785). Based on his reported symptoms, he did not appear to meet the criteria for depressive disorder; although, he reported significant depressive symptoms. (*Id.*). Claimant scored in the mild range (7 out of 27) on the PHQ-9 depression test.[1] (Tr. at 787). He reported that his depressive symptoms did not interfere with his ability to work, take care of things at home, or get along with others. (*Id.*). Claimant also had mild anxiety symptoms, which were consistent with generalized anxiety disorder. (Tr. at 788). He reported that his anxiety made it somewhat difficult to work, take care of things at home, and get along with others. (*Id.*). Claimant also reported that he had daily pain that averaged 2 on a 10-point pain scale. (Tr. at 789).

On July 20, 2012, Claimant received supportive psychotherapy for his depression.

---

[1] The PHQ-9 is a self-administered version of the PRIME-MD diagnostic instrument for common mental disorders. It scores each of the nine DSM-IV criteria as "0" (not at all) to "3" (nearly every day).  The total of the nine scores is used to rate the severity of depression. A total score of 0-4 is "none," 5-9 is "mild," 10-14 is "moderate," 15-19 is "moderately severe," and 20-27 is "severe." http://patient.info/doctor/patient-health-questionnaire-phq-9

(Tr. at 755). He reported having taken psychotropic medication in the past when he was going through a divorce, but he stopped taking the medication of his own volition. Claimant had been a pastor for 14 years prior to his divorce and believed that his depression began around that time and may have contributed to his divorce. (*Id.*). He was currently homeless and unemployed, which was stressful, but he was going to start a new full-time job in a few days in security and maintenance for the Huntington Parks and Recreation Service. (Tr. at 755). Claimant reported that he was recently prescribed Abilify and something else that he could not recall, but those medications were ineffective and actually made his condition worse. (*Id.*). Claimant had a depressed mood, but his mental status examination was otherwise normal. (Tr. at 757-58). He was restarted on Prozac. (Tr. at 758-59).

On August 20, 2012, Saka Rotimi Disu, M.D., a staff physician at the VA, completed documentation in connection with Claimant's application for service-connected disability benefits related to his flatfoot (pes planus) condition. (Tr. at 734). Dr. Disu noted that Claimant had pes planus and plantar fasciitis in both feet and halgus valgus deformities on the left. (Tr. at 735). Claimant reported that his condition was asymptomatic prior to enlistment, but worsened during basic training and continued to worsen over time. (*Id.*). The pain was aggravated by prolonged walking, standing, and exercise. (*Id.*). X-rays of Claimant's feet showed halux valgus deformities associated with degenerative changes at the first metatarsophalangeal (MTP) joints and calcaneal spurs. (Tr. at 740). The condition was marked and severe in his left foot, but mild in his right foot. (*Id.*). Dr. Disu opined that Claimant's condition did not impact his ability to work. (Tr. at 741). She stated that the cause of the foot pain was plantar fasciitis and hallux valgus deformities, which clearly existed prior to service, but were aggravated beyond their natural progression by

an in-service injury. (Tr. at 741, 744). Claimant began receiving 30 percent service-connected disability payments for his foot conditions. (Tr. at 542-43).

On August 27, 2012, Claimant had another psychotherapy session and scored in the lowest range of minimal depressive symptoms (1 out of 27) on the PHQ-9 test. (Tr. at 725-26). Claimant had moved into housing and reported compliance with his medication with no side effects. (Tr. at 725). He stated that his depressive symptoms did not make it difficult to do his work, take care of things at home, or get along with others. (Tr. at 726). Claimant indicated that he was "doing good," stating that his depressive symptoms had decreased since he restarted Prozac. (Tr. at 728). He was doing well at his job and there were no issues on his mental status examination. (Tr. at 728-29).

During Claimant's next psychotherapy session in September 2012, Claimant was "doing fairly good." (Tr. at 723). He had one brief episode of depression two weeks earlier that lasted a day and a half, but he continued to be very goal-oriented and was working to stay focused on his goals. (*Id.*). Claimant's job was going well, and he enjoyed it. (*Id.*). Claimant continued to have pain in his feet, which he currently rated 6 out of 10, and he intended to follow-up with podiatry. (*Id.*). His mental status examination was normal. (*Id.*).

At his next visit in October 2012, Claimant continued to do well. (Tr. at 719). He had started working full-time and received a good evaluation at work. (*Id.*). Claimant confirmed that he was working toward his goals and toward becoming more active and social. (Tr. at 719-20). Nevertheless, he was still not sleeping well. Claimant's therapist discussed good sleep habits with him, which Claimant agreed to incorporate into his routine. (Tr. at 720). His mental status examination was normal. (*Id.*).

The following month, in November 2012, Claimant reported that he had been sick

and had some small depressive episodes. (Tr. at 1168). He was interested in changing his psychiatric medication, but wanted to wait until after Christmas because he had no time off and did not know if he would have side effects. (*Id.*). Claimant stated that when he got sick, his depressive symptoms increased, causing him to withdraw from people. He had missed three days of work. (*Id.*).

In January 2013, Claimant stated during a psychotherapy session that his depression kept returning and every three to four weeks he reached a point where he could not function. (Tr. at 714). He stated that it caused him to miss work and, although his employer was working with him regarding his absences, he was fearful of losing his job. (*Id.*). Claimant reported more frequent and extended depressive episodes, but they had not prevented him from going to Indiana to visit his daughter. (*Id.*). Claimant was agreeable to being referred to Gateway Clinic for long-term therapy and medication management. (Tr. at 715).

Later that month, on January 22, 2013, Claimant was evaluated at Gateway Clinic. (Tr. at 703). He reported having episodes in which he "shut[] down" and could not function. (*Id.*). His mental status examination was normal, other than the fact that he described his mood as "low." (*Id.*).Claimant stated that he was not depressed, yet he did not feel like himself either. (*Id.*). He reported that his depression began in 1986, but had worsened in the past few years. (Tr. at 705). During episodes, he isolated himself and waited for the symptoms to pass. (*Id.*). Claimant felt better when he was working and active. He felt his medication and therapy were helpful, but were not alleviating all of his symptoms, which he described as getting worse. (*Id.*). In particular, he often missed work due to depressive symptoms and also experienced insomnia. (*Id.*). He reported pain that was 7 out of 10 in his feet and was chronic. (Tr. at 707). The plan was to continue

Claimant's Prozac prescription and start him on Wellbutrin in the mornings. (Tr. at 703). Claimant was also referred for outpatient medication management and individual therapy to address his symptoms of depression. (Tr. at 712-13).

On February 4, 2013, Claimant had an individual therapy session and stated that he thought Wellbutrin was really helping. (Tr. at 700). His mood was improved, he had increased energy, and he had started a new relationship. (*Id.*). His mental status examination was normal other than slight anxiousness and restlessness. (*Id.*). He responded well during the session. (Tr. at 701).

The following month, on March 12, 2013, Claimant saw an advanced practice nurse practitioner at the VA's mental health clinic. (Tr. at 689). Claimant reported that he had discontinued Prozac one month earlier because it caused sexual dysfunction. (*Id.*). He rated his mood as 6 out of 10 and described it as "low, anxious, and depressed"; however, his sleep was improved. (*Id.*). Claimant was recently fired from the Huntington Parks and Recreation Service because he could not "do his job." (Tr. at 690). He again reported periods that he "shut down" due to depression and anxiety and, during those times, he withdrew and isolated himself. (*Id.*). Claimant felt that his depression was getting progressively worse, and he had a new onset of panic attacks that lasted a few minutes at a time. (*Id.*). He stated that as a former pastor and counselor, he knew the tools to manage his issues, but was unable to use them for his own good. (*Id.*). He was working on finding a new job and relationship and was taking Wellbutrin daily. Claimant's mental status examination was normal other than his anxious and depressed mood. He was started on Vistaril for anxiety, as needed, and Wellbutrin was continued for mood. (Tr. at 691).

The following week, Claimant had an individual therapy session in which he stated that he had no significant depressive episodes, but feared "that one is coming most of the

time." (Tr. at 684). He was fully oriented, had logical thought processes, good eye contact, euthymic mood, was casually groomed, was neat and clean, and had no psychosis. (*Id.*). However, he was still slightly anxious and restless. (*Id.*). Claimant responded "fair/good" in the therapy session. (*Id.*). On the same date, he presented to podiatry for painful bunions and cramping in his feet. (Tr. at 685). An examination revealed a severe bunion on the left, a moderately severe bunion on the right, and loss of motion in his left MPJ. X-rays revealed deformities in his feet. (*Id.*). The podiatrist discussed surgical correction and Claimant expressed that he would like to be placed on the waiting list. (*Id.*).

Two days later, on March 20, 2013, Claimant reported to his therapist that he was offered a job-training program with Harmony House. (Tr. at 677). He was very excited about the opportunity, much more upbeat, and optimistic. (*Id.*). However, he did note that he was applying to increase his service-connected disability for his feet and obtain service-connected disability for depression. (*Id.*).

In April 2013, Claimant was examined regarding his pes planus condition. (Tr. at 664). It was again noted that he had pes planus, hallux valgus deformities, and plantar fasciitis in both feet. (Tr. at 665). Claimant reported spasms in the plantar surface of his left foot three times per day and in his right foot once per day. (Tr. at 666). The spasms lasted 20 seconds and were aggravated by walking or stepping on something. (*Id.*). He stated that arch supports did not significantly change the pain or frequency of the spasms. (*Id.*).

On April 23, 2013, Claimant voluntarily entered inpatient mental health treatment for suicidal ideation, depression, and alcohol dependence. The treatment occurred after his former fiancé, who was also his neighbor, discovered him heavily intoxicated, depressed, and curled-up on his couch with a butcher knife on the floor next to him. He

was distraught, in part, over the breakup of their relationship. (Tr. at 470, 479, 519, 650, 1100). She asked if she should remove the knife and he responded affirmatively; she then sought help for him. (*Id.*). Claimant stated that his depression worsened and alcohol use increased in the past several weeks due to his relationship problems. (Tr. at 518). He denied any plan or intent to actually harm himself. (Tr. at 645, 649). Claimant felt that he had lost his way from his past work as a pastor and therapist and felt like a failure. (Tr. at 470). He stated that he went through a difficult divorce eight years earlier, which led to his alcohol use. (Tr. at 1096). He did not drink daily, but drank excessively when depressed. (*Id.*). He had recently missed work due to binge drinking. (Tr. at 518).

During in-patient treatment, Claimant participated in group counseling and went through alcohol withdrawal. He was actively involved in treatment, insightful, and appeared to improve significantly. (Tr. at 480-82). He voiced plans for a recovery program and was discharged in stable condition for outpatient treatment as he requested. (*Id.*). Wellbutrin was discontinued because he had been in alcohol withdrawal and reported increased anxiety and insomnia. (Tr. at 646, 806). He was prescribed Remeron to take a bedtime, which he tolerated well. (*Id.*). The impression was major depression and alcohol dependence. (Tr. at 483). He also reported continuous bilateral foot pain that he rated 6 out of 10. (Tr. at 478, 662).

After discharge, Claimant advised his therapist on May 2, 2013 that he had stopped drinking and that his depression and sleep issues were improved. (Tr. at 1052). Later that month, Claimant stated that he was doing well and was happy about his new job with the Huntington Parks and Recreation Service. (Tr. at 1048). He rated his average level of depression as 4 out of 10. (*Id.*). He was thankful that his former fiancé assisted him in getting help. (*Id.*).

On June 18, 2013, Claimant had another individual therapy session regarding his depression. (Tr. at 584). He said that his job with the Huntington Parks and Recreation Service was hard on his feet, but was working for the time being. (*Id.*). He added that his recent hospitalization was "extremely healing" and, since then, he took only Remeron for his depression. (*Id.*). Claimant related that the hospitalization resulted from being "stalked" by his former fiancé and "bottom[ing] out with depression," which triggered alcohol abuse. (*Id.*). However, he stated that alcohol use was no longer a problem. Claimant's mood was euthymic, although he was slightly anxious and restless. His thoughts and eye contact were normal, and he had no psychosis. (*Id.*).

During his next monthly individual therapy session in September 2013, Claimant reported that he had experienced some "ups and downs," but was doing well overall. (Tr. at 575). He was frustrated that his depression always returned, and he continued to have chronic pain in his feet. (*Id.*). In October 2013, Claimant reported that he had "been doing very good" and that his mood had been stable. (Tr. at 573). He had some frustration and mild anxiety at times, but could not provide an example. (*Id.*). He stated that he might be offered a permanent position at his job and had applied for other jobs, as he was feeling more motivated in general. (*Id.*). His mood was good, but he was still slightly anxious and restless. (*Id.*).

On November 12, 2013, Claimant was seen for mental health assessment and medication evaluation by psychiatrist, Shah Nadeem, M.D. (Tr. at 570). Claimant reported episodes of depression and anxiety. (*Id.*).  During depressive episodes, he isolated himself and became irritable. (*Id.*). However, Claimant did not feel depressed at present and was still employed. (*Id.*). His sleep was poor, lasting no more than four hours, but he had no suicidal ideation or psychosis. (*Id.*). He was alert, oriented, pleasant, and

cooperative. (Tr. at 570-71). He had good eye contact, normal speech, and was not agitated. (Tr. at 571). As far as mood, he stated that he was "OK," but appeared to be depressed. (*Id.*). His thought processes were logical and coherent; his concentration, judgment, and insight were good, and his memory was intact. (*Id.*). Dr. Nadeem assessed Claimant with depressive disorder, not otherwise specified, by history. (*Id.*). Dr. Nadeem planned to restart Claimant on Wellbutrin for mood and provide medication for sleep. (*Id.*).

Later that month, on November 25, 2013, Claimant was seen for bilateral foot pain. (Tr. at 563). The pain was most severe in the middle and medial side of his left foot. (*Id.*). He experienced recurrent spasms in that area. (*Id.*). His arch inserts were helping the pain, and he otherwise used ibuprofen as needed. (*Id.*). He did not want any other medications, but did request more inserts. (*Id.*). Claimant's depression was described as improved now that he was again taking Wellbutrin. (*Id.*). His foot pain was 6 out of 10. (Tr. at 565).

On December 3, 2013, Claimant had another individual therapy session. (Tr. at 562). Claimant stated that he was "doing OK," although his ongoing foot pain exacerbated his depression. He described feeling more confident in handling emotions and physical issues and felt less stressed since "accepting" his depression, although he sometimes still dwelled on the vilification he felt in the past related to his divorce. (*Id.*). Claimant responded well during the session and requested monthly follow-up. (*Id.*).

Eight days later, on December 11, 2013, Claimant reported that he lost his job and his fiancé after suffering another bout of depression. (Tr. at 561). He left his home, stayed in a hotel for four days, and did not go to work. Claimant was fired from his job, and his fiancé broke off their engagement. (Tr. at 559, 561). He denied significant alcohol use or

suicidal ideation, but thought that he needed more aggressive treatment as his medication was no longer working. (Tr. at 561).

During a therapy session later that month, Claimant again stated that he needed more aggressive treatment and reported that he was tired of "taking flight," which meant isolating himself from others. (Tr. at 559). During the session, his thoughts were logical, he was fully oriented, had good eye contact, and did not have any psychosis; however, he was "somewhat restless" and anxious. (*Id.*). The assessment was unspecified depressive disorder and unspecified alcohol use disorder. (*Id.*). The plan was for Claimant to follow-up with outpatient therapy. (*Id.*).

On January 14, 2014, Claimant saw his psychiatrist for medication assessment. (Tr. at 988). He reported that he was depressed most of the time and feeling hopeless. (*Id.*). He was taking his medications without side effects. (Tr. at 989). Claimant's mental status examination was normal other than his depressed mood. (*Id.*). The psychiatrist increased Claimant's dosages of Wellbutrin and trazodone. (*Id.*). Claimant also continued to complain of foot pain and had received new inserts, but stated that he had "been in a lot of pain" in his feet, legs, and shoulder, which was more intense recently. (Tr. at 512-13).

On February 10, 2014, Claimant presented to the emergency room following suicidal statements and thoughts. (Tr. at 974). He reported not feeling safe at that time, indicating that he had "bottomed out" after his relationship dissolved two days prior. (Tr. at 974-75). Claimant earlier drove by the river and considered suicide. (Tr. at 974). He stated that he did not understand his depression and that it had been a constant battle in his life. (*Id.*). Claimant was admitted for inpatient psychiatric treatment. (Tr. at 977). He reported "dealing with depression on and off for 2 years." (Tr. at 1283). He was primarily stressed about his relationship issues, but was also unemployed and planned to apply for

social security. (*Id.*). His mood, anxiety, and sleep issues improved during his inpatient treatment. (Tr. at 1284-86). At the time of discharge on February 18, 2014, Claimant's mood was "pretty good." (Tr. at 1286). He planned to stay in a shelter while he waited for government housing and was going to follow up with outpatient treatment. (*Id.*, Tr. at 1297). His diagnosis was adjustment disorder with depression, homelessness, and alcohol dependence. (Tr. at 1297). Claimant was not depressed at the time of discharge. (Tr. at 1296).

Claimant had a post-discharge follow-up appointment on February 25, 2014. (Tr. at 966). He was doing well since his hospitalization. Claimant reported feeling more hopeful about life and less depressed. He had increased socialization and believed his relationship stressor had resolved. (Tr. at 967). Claimant added that his hospitalization had been beneficial. (*Id.*). His mental status examination was normal. (Tr. at 968).

The following month, on March 11, 2014, Claimant was seen for medication evaluation. (Tr. at 962). He still sometimes had depression, but "not now a days." (Tr. at 962, 964). He stated that he felt "OK," and his mental status examination was normal. (*Id.*). Claimant was told to continue taking Wellbutrin for mood and trazodone at bedtime, start taking Zoloft at bedtime, continue individual therapy, and return for follow-up in two months. (Tr. at 963). During his individual therapy session that month, Claimant reported that he was "bouncing from place to place," because he was homeless and living with different friends. (Tr. at 1572). He had applied for homeless services and social security disability. (*Id.*). Claimant admitted that he continued to drink alcohol on occasion, but it was not a problem, and his sleep was variable but slightly improved. (*Id.*). He reported a few crying spells, but had no suicidal ideation. (*Id.*). Other than being slightly restless, his mental status examination was normal, and his mood was described

17

as "less anxious." (*Id.*). Claimant expressed interest in the Guitars for Vets program. (*Id.*).

Later, in April 2014, Claimant reported "[d]oing OK" and felt that his mood was fairly stable. (Tr. at 1555). He had anxiety at times, but took hydroxyzine as needed. (*Id.*). Claimant's mood appeared less anxious. Although he was somewhat restless, Claimant's mental status examination was unremarkable. (*Id.*). He began attending group therapies that month in the intensive outpatient program. (Tr. at 1624). It was noted that his history of alcohol dependence may have contributed to or completely accounted for his reported depression and sleep disturbance. (Tr. at 1625). Claimant would need to be sober for at least six months to determine whether his mental health symptoms were alcohol-related or were related to his service-connected pes planus condition. (*Id.*).

On May 11, 2015, Claimant stated that his depression was better that day. (Tr. at 1633). X-rays of his feet showed slight progression of the right hallux deformity of his left foot, but no other significant changes. (Tr. at 1739). Claimant was participating in peer support groups almost daily. (Tr. at 1620).

In July 2015, Claimant presented for a podiatry consultation, reporting that his inserts helped some, but his feet still hurt. (Tr. at 26). His pain was rated at 5 out of 10 and was sharp when walking. Claimant was assessed was hallux valgus, heel spurs, and foot pain. (Tr. at 27). He was ordered custom-made accommodative orthotics. (*Id.*). At his prosthetics consultation the following month, Claimant rated his pain as 7 out of 10. (Tr. at 15). He also reported some depressive episodes. (Tr. at 1694).

In September 2015, Claimant called his social worker and asked if he could play his guitar at a homeless veterans' event. (Tr. at 35). In addition, he reported that he went to his friend's residence the prior weekend and had a good weekend. (*Id.*). Claimant also attended a veterans' event called Stand Down. (Tr. at 34). His therapist noted that he

stayed for the entire program, was very pleased, won several things, and "stated that he enjoyed his time there." (*Id.*). He reported that he was going to speak to the City Mission about using his pastoral skills at that facility. (*Id.*). He further participated in group therapy, and his response was noted as "good" and "very interactive." (Tr. at 30).

### B. Evaluations and Opinions

On February 14, 2014, Timothy Saar, Ph.D, completed a psychiatric review technique form (PRTF) based upon his review of Claimant's records. He concluded that Claimant did not have a severe mental impairment. (Tr. at 170). Dr. Saar considered Claimant's conditions under Listings 12.04 (affective disorders) and 12.09 (substance addiction disorders) and found that Claimant did not satisfy the criteria of either listing. (*Id.*). He further found that Claimant had no limitation in activities of daily living; mild limitation in maintaining social functioning and concentration, persistence, or pace; and one or two episodes of decompensation of extended duration. (Tr. at 171). He found Claimant partially credible, as his claims were not fully supported by the medical evidence of record. (*Id.*). Two other psychologists subsequently reviewed Claimant's records and affirmed Dr. Saar's findings. (Tr. at 194-95, 198, 1437-1438).

On February 15, 2014, James Binder, M.D., assessed Claimant's RFC based upon a review of the records. Dr. Binder opined that Claimant could perform a full range of medium work, noting that Claimant had flat feet and pain in his feet, but wore inserts to alleviate the pain, could walk 4 to 5 blocks, and had hypertension with no end-stage organ damage. (Tr. at 172). He opined that Claimant could work in positions such as a dry cleaner helper, drier operator, and laundry worker. (Tr. at 174). Dr. Binder added that substance abuse was documented, but a "DAA material determination was not required." (*Id.*).  A second state agency consultant, Fulvio Franyutti, M.D., affirmed Dr. Binder's

assessment on May 22, 2014. (Tr. at 196-97).

## VI. <u>Scope of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson,* the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed applicable regulations and rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII. <u>Discussion</u>

### A. **Pain and Credibility Analysis**

In his first challenge to the Commissioner's decision, Claimant asserts that the ALJ failed to properly consider his "disabling pain in feet and legs" and failed to perform any credibility determination. (ECF No. 12 at 5-6).

Pursuant to 20 C.F.R. §§ 404.1529, 416.929, the ALJ evaluates a claimant's report

of symptoms, including pain, using a two-step method. First, the ALJ must determine whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms. 20 C.F.R. §§ 404.1529(a), 416.929(a). In other words, "an individual's statements of symptoms alone are not enough to establish the existence of a physical or mental impairment or disability." Social Security Ruling ("SSR") 16-3p, 2016 WL 1119029, at *2 (S.S.A. 2016). Instead, there must exist some objective "[m]edical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques" which demonstrate "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. §§ 404.1529(b), 416.929(b).

Second, after establishing that the claimant's conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.* §§ 404.1529(a), 416.929(a). If the intensity, persistence, or severity of the symptoms cannot be established by objective medical evidence, the ALJ must consider "other evidence in the record in reaching a conclusion about the intensity, persistence, and limiting effects of an individual's symptoms," including a claimant's own statements. SSR 16-3p, 2016 WL 1119029, at *5-*6. In evaluating a claimant's statements regarding his or her symptoms, the ALJ will consider "all of the relevant evidence," including (1) the claimant's medical history, signs and laboratory findings, and statements from the claimant, treating sources, and non-treating sources, 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1); (2) objective medical evidence, which is obtained from the application of medically acceptable clinical and laboratory diagnostic

21

techniques, *id.* §§ 404.1529(c)(2), 416.929(c)(2); and (3) any other evidence relevant to the claimant's symptoms, such as evidence of the claimant's daily activities, specific descriptions of symptoms (location, duration, frequency and intensity), precipitating and aggravating factors, medication or medical treatment and resulting side effects received to alleviate symptoms, and any other factors relating to functional limitations and restrictions due to the claimant's symptoms. *Id.* §§ 404.1529(c)(3), 416.929(c)(3); *see also Craig*, 76 F.3d at 595; SSR 16-3p, 2016 WL 1119029, at *4-*7. In *Hines v. Barnhart*, the Fourth Circuit stated that:

> Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges he suffers.

453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595). The ALJ may not reject a claimant's allegations of intensity and persistence solely because the available objective medical evidence does not substantiate the allegations; however, the lack of objective medical evidence may be one factor considered by the ALJ. SSR 16-3p, 2016 WL 1119029, at *5.

SSR 16-3p provides further guidance on how to evaluate a claimant's statements regarding the intensity, persistence, and limiting effects of his or her symptoms. For example, the Ruling stresses that the consistency of a claimant's own statements should be considered in determining whether a claimant's reported symptoms affect his or her ability to perform work-related activities. *Id.* at *8. Likewise, the longitudinal medical record is a valuable indicator of the extent to which a claimant's reported symptoms will reduce his or her capacity to perform work-related activities. *Id.* A longitudinal medical record demonstrating the claimant's attempts to seek and follow treatment for symptoms

may support a claimant's report of symptoms. *Id.* On the other hand, an ALJ "may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record," where "the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints," or "the individual fails to follow prescribed treatment that might improve symptoms." *Id.*

Ultimately, "it is not sufficient for [an ALJ] to make a single, conclusory statement that 'the individual's statements about his or her symptoms have been considered' or that 'the statements about the individual's symptoms are (or are not) supported or consistent.' It is also not enough for [an ALJ] simply to recite the factors described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the [ALJ] evaluated the individual's symptoms." *Id.* at *9. SSR 16-3p instructs that "[t]he focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person"; rather, the core of an ALJ's inquiry is "whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities." *Id.* at *10.

When considering whether an ALJ's evaluation of a claimant's reported symptoms is supported by substantial evidence, the Court does not replace its own assessment for that of the ALJ; rather, the Court scrutinize the evidence to determine if it is sufficient to support the ALJ's conclusions. In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence, reach independent determinations as to the

weight to be afforded to a claimant's report of symptoms, or substitute its own judgment for that of the Commissioner. *Hays*, 907 F.2d at 1456. Because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

Here, the ALJ performed the requisite two-step analysis. The ALJ noted Claimant's alleged limitations and found that Claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms. (Tr. at 115). However, the ALJ found that Claimant's statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely credible. (*Id.*). The ALJ stated that Claimant had a good earnings record, which was suggestive that Claimant would likely be working if he felt that he was capable; yet, on balance, the ALJ found that this factor was outweighed by other factors such as Claimant's good response to conservative treatment. (*Id.*). The ALJ noted that although Claimant's imaging and objective findings suggested vocational limitations, he responded well to conservative treatment consisting of arch insoles and over-the-counter medication. (*Id.*).

Contrary to Claimant's argument, the ALJ specifically considered Claimant's leg and foot pain in assessing his credibility and determining his RFC. In fact, the ALJ gave little weight to the state agency consultants' opinions that Claimant was capable of medium work, finding that the record showed greater limitation. (*Id.*). The ALJ noted that in November 2013, Claimant reported bilateral foot pain and spasms and his examination revealed red, tender bunions in his left foot and a contracted and tender left calf. The ALJ stated that the "exam showed that the claimant was experiencing significant pain from this hallux deformity and calcaneal spurs that likely affected the claimant's

ability to walk or stand," which the ALJ found to be consistent with Claimant's statements that he could walk one to five blocks before stopping and could shop for up to one hour and a half. (*Id.*). Therefore, after weighing the evidence, the ALJ concluded that Claimant's "level of activity and the corroborating findings on imaging suggest that the claimant is limited to a sedentary range of work." (*Id.*). Thus, while the ALJ clearly found merit in Claimant's foot and leg complaints, the ALJ stated that Claimant's good response to conservative treatment, including over-the-counter medication and insoles, showed that no greater limitations were warranted. The ALJ cited that Claimant reported that the insoles helped and he also continued working following the diagnosis of his foot impairment. (*Id.*).

As shown above, the decision clearly demonstrates that the ALJ thoroughly considered and articulated his analysis of all of the evidence, including Claimant's alleged pain and symptoms, the objective evidence of Claimant's medical treatment, and the various sources of opinion evidence. It is not within the court's jurisdiction to "re-weigh conflicting evidence, reach independent determinations as to the weight to be afforded to a claimant's report of symptoms, or substitute its own judgment for that of the Commissioner." *Hays*, 907 F.2d at 1456. In this case, reviewing the ALJ's analysis and comparing it to the evidence of record, the undersigned finds substantial support for the ALJ's analysis of Claimant's pain and credibility.

As noted by the ALJ, Claimant continued working following the diagnosis of his foot impairment in August 2012. (Tr. at 116). In fact, notwithstanding his foot pain, Claimant worked full-time for over a year as a night watchman/security guard for the Huntington Parks and Recreation Service until, as he stated, he was terminated due to absenteeism caused by an episode of depression. (Tr. at 141-42, 153, 158). There is no

indication that Claimant's foot condition prevented him from working or that it substantially worsened during the relevant period beginning in October 2013. Both during Claimant's employment and during the relevant period, Claimant expressed the same complaints of pain and spasms in his feet and, at various times, rated his pain a 5, 6, and 7 out of 10. (Tr. at 15, 26-27, 512-13, 562-63). As the ALJ referenced, Claimant confirmed that arch inserts were helping the pain and, otherwise, he took ibuprofen as needed. (Tr. at 563). Claimant did not want any other medications. (*Id.*). X-rays taken in May 2015 showed only slight progression of the right hallux deformity of his left foot, but no other significant changes. (Tr. at 1739). During a podiatry consult in July 2015, Claimant again reported that the inserts were helping, but stated that his feet still hurt; he was thus fitted for custom orthotics, which he received in October 2015. (Tr. at 26-27). While Claimant expressed interest in corrective surgery and was evidently placed on a waiting list in March 2013, records as late as August 2015 do not reflect that Claimant ever underwent surgery, nor do any of his records reflect that surgery was imperative. (Tr. at 15, 26-27, 685). Overall, the evidence substantially supports the ALJ's analysis and finding that Claimant responded positively to conservative treatment, which belied his allegations of disabling foot and leg pain.

The ALJ analyzed the various statements made by Claimant, Claimant's treatment records, all of the expert opinions, Claimant's daily activities, and other factors in evaluating Claimant's credibility. The ALJ provided a well-supported analysis for the weight that he assigned to each piece of evidence. For all of the reasons discussed above, the undersigned **FINDS** that the ALJ's decision complies with 20 C.F.R. §§ 404.1529, 416.929, and SSR 16-3p and is supported by substantial evidence.

26

## B. Combination of Impairments

In his second challenge to the Commissioner's decision, Claimant contends that the ALJ failed to consider the combination of his impairments, including his depression, anxiety, and foot and leg pain. (ECF No. 12 at 7).

Claimant recites the applicable case law, but fails to provide any factual basis for this challenge. Undoubtedly, the ALJ was required to consider the combined, synergistic effect of all of Claimant's medically determinable impairments, severe and non-severe, to accurately evaluate the extent of their resulting limitations on Claimant. *Walker v. Bowen,* 889 F.2d 47 (4th Cir. 1989). The relevant regulations provide:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.

20 C.F.R. §§ 404.1523, 416.923. Where there is a combination of impairments, the issue "is not only the existence of the problems, but also the degree of their severity, and whether, together, they impaired the claimant's ability to engage in substantial gainful activity." *Oppenheim v. Finch*, 495 F.2d 396, 398 (4th Cir. 1974). The ailments should not be fractionalized and considered in isolation, but considered in combination to determine the impact on the ability of the claimant to engage in substantial gainful activity. *Id.* The cumulative or synergistic effect that the various impairments have on claimant's ability to work must be analyzed. *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983). As the United States Court of Appeals for the Fourth Circuit stated in *Walker,* "[i]t is axiomatic that disability may result from a number of impairments which, taken separately, might not be disabling, but whose total effect, taken together, is to render

27

claimant unable to engage in substantial gainful activity." *Walker,* 889 F.2d at 50.

In this case, the ALJ fulfilled the obligation to evaluate Claimant's impairments, separately and in combination. The ALJ thoroughly analyzed Claimant's mental disorders, including Claimant's adjustment disorder, depressive disorder, anxiety disorder, and alcohol abuse. (Tr. at 112). The ALJ discussed, *inter alia*, that Claimant's medical records demonstrated that Claimant had stable mood and normal mental status examinations when he was compliant with his medications. (Tr. at 112-13). The ALJ analyzed the broad functional areas known as "paragraph B" criteria and determined that Claimant had no more than mild impairments in activities of daily living; social functioning; and concentration, persistence, or pace. (*Id.*). Further, the ALJ noted that Claimant's psychiatric hospitalization during the relevant period was not of sufficient length to be considered an episode of decompensation of extended duration. (Tr. at 113). The ALJ also indicated that Claimant's reported activities, including caring for himself and spending time with others, weighed against his claims of anything more than mild limitations in the above functional categories. (*Id.*).

The ALJ further considered Claimant's mental impairments in combination with his leg and feet impairments when constructing his RFC finding. Within his exhaustive analysis of Claimant's leg and feet impairments, the ALJ noted that in November 2013 Claimant's other conditions were well-controlled on medication, including his depression. (Tr. at 116). As shown above, the ALJ thoroughly analyzed and discussed Claimant's mental and physical impairments. The decision clearly articulates the ALJ's well-supported rationale for finding that Claimant's impairments, alone or in combination, did not preclude him from engaging in substantial gainful activity. To the extent that the ALJ did not elaborate further on the analysis of Claimant's impairments

in combination, the undersigned finds this to be unnecessary, or at worst, harmless error.[2]

Furthermore, the ALJ demonstrated during the administrative hearing that he unequivocally considered the combination of Claimant's impairments. The ALJ posed several hypothetical questions, each of which built upon the last by adding to the combination of impairments. The ALJ asked the vocational expert to assume a hypothetical individual of Claimant's age, education level, and past relevant work. (Tr. at 160). The ALJ first questioned if such a person could perform Claimant's past relevant work if he was limited to a full range of light work. (Tr. at 161). After receiving an affirmative answer, the ALJ questioned if the person could also perform Claimant's past relevant work if he was limited to a full range of sedentary work. (*Id.*). The expert stated that such a person could perform Claimant's past job as an in-home therapist. (*Id.*). The ALJ then added a mental limitation, questioning whether that hypothetical individual could work if he was also limited to no more than occasional interaction with coworkers, supervisors, and the general public. (Tr. at 162). The expert stated that the individual could not perform Claimant's past work, but could perform other jobs, which the expert identified. (*Id.*). Finally, the ALJ questioned the expert how an additional limitation to

---

[2] Courts have applied a harmless error analysis in the context of Social Security appeals. One illustrative case provides:

> Moreover, "[p]rocedural perfection in administrative proceedings is not required. This court will not vacate a judgment unless the substantial rights of a party have been affected." <u>Mays v. Bowen</u>, 837 F.2d 1362, 1364 (5th Cir.1988). The procedural improprieties alleged by [claimant] will therefore constitute a basis for remand only if such improprieties would cast into doubt the existence of substantial evidence to support the ALJ's decision.

*Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988); *See, also, Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result."). Our Court of Appeals, in a number of unpublished decisions, has taken the same approach. *See, e.g., Bishop v. Barnhart*, No. 03-1657, 2003 WL 22383983, at *1 (4th Cir. Oct 20, 2003); *Camp v. Massanari*, No. 01-1924, 2001 WL 1658913, at *1 (4th Cir. Dec 27, 2001); *Spencer v. Chater*, No. 95-2171, 1996 WL 36907, at *1 (4th Cir. Jan. 31, 1996).

simple, routine tasks would impact the hypothetical individual's ability to work, as well as how work absences would be tolerated. (Tr. at 162-63).

While the ALJ ultimately did not determine that the evidence supported the above combination of impairments in this case, the overall decision and administrative hearing transcript makes clear that the ALJ considered all of impairments alone, and in combination, in rendering his decision in this case. Therefore, the undersigned **FINDS** that the ALJ complied with his duty under the applicable law to consider Claimant's impairments in combination.

### C. Duty to Develop the Evidence

Claimant next argues that the ALJ failed to "adequately develop the devastating effects of Claimant's episodes of depression on his activities of daily living and ability to work." (ECF No. 12 at 7-8).

Again, Claimant articulates a legal standard related to this challenge, but fails to provide a factual basis to discern the applicability of that standard to the present case. Claimant does not identify any inadequacies or gaps in the record that the ALJ should have developed. The ALJ's duty was to insure that the record contained sufficient evidence upon which he could make an informed decision. *Ingram v. Commissioner of Social Security Administration,* 496 F.3d 1253, 1269 (11th Cir. 2007); *See also, Weise v. Astrue,* Civ. Action No. 1:08-0271, 2009 WL 3248086 (S.D. W. Va. Sept. 30, 2009). Consequently, when examining the record to determine if it was adequate to support a reasoned administrative decision, the court looks for evidentiary gaps that resulted in "unfairness or clear prejudice" to Claimant. *Marsh v. Harris,* 632 F.2d 296, 300 (4th Cir. 1980).

In this case, the record is replete with Claimant's mental health treatment notes,

spanning throughout the relevant period. These records generally provide monthly accounts of Claimant's depression diagnosis, treatment, and functioning. The voluminous treatment notes specifically discuss how Claimant's depression did or did not impact his activities of daily living and ability to work. *See, e.g.,* (Tr. at 518, 559, 561, 573, 570, 677, 690, 700, 705, 714, 719-20, 723, 727-29, 787, 1048, 1168). Further, in addition to all of the documentation that Claimant submitted concerning his daily activities, work history, and depression, those issues were specifically discussed in the administrative hearing. The ALJ and Claimant's counsel meticulously questioned Claimant regarding the effect of his depression on his ability to work and function. (Tr. at 140-46, 148-52, 154-57). Claimant testified at length in support of his allegations that depression caused him to "shut down," isolate himself, miss work, lose his job, and caused relationship issues and psychiatric inpatient treatment. (*Id.*). Consequently, the undersigned **FINDS** no evidentiary gaps in the record and no merit to Claimant's assertion that the ALJ failed to fulfill his duty to develop the record.

### D. Presumption of Disability

In his final challenge to the Commissioner's decision, Claimant argues that the ALJ did not carry his burden to produce evidence sufficient to rebut the "presumption of disability." (ECF No. 12 at 8-9). Claimant states that he "continues to be unable to engage in substantial gainful activity" and "there was not substantial evidence to rebut the presumption of disability;" therefore, the decision to deny him benefits "is clearly wrong and should be reversed." (*Id.* at 9).

The undersigned finds this contention to be equally without merit. Claimant is ultimately responsible for proving that he is disabled, and that responsibility never shifts to the Commissioner. While the Commissioner may have a duty to go forward with the

evidence at the fourth step of the evaluation, Claimant nonetheless retains "the risk of non-persuasion." *Seacrist v. Weinberger*, 538 F.2d 1054, 1057 (4th Cir. 1976).

The SSA recognizes at the fourth step of the sequential disability evaluation that when a claimant proves the existence of severe impairments that prevent the performance of past relevant work, the claimant has established a *prima facie* case of disability. The burden of production then shifts to the Commissioner to provide evidence demonstrating that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§404.1520(g); *See also*, *McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d. 572, 574 (4th Cir. 1976).

In order to carry this burden, the Commissioner may rely upon medical-vocational guidelines listed in Appendix 2 of Subpart P of Part 404 ("grids"), which "take administrative notice of the availability of job types in the national economy for persons having certain characteristics, namely age, education, previous work experience, and residual functional capacity." *Grant v. Schweiker*, 699 F.2d 189, 191-192 (4th Cir. 1983); *See also* 20 C.F.R. § 404.1569. However, the grids consider only the "exertional" component of a claimant's disability in determining whether jobs exist in the national economy that the claimant can perform. *Id.* For that reason, when a claimant has significant nonexertional impairments or has a combination of exertional and nonexertional impairments, the grids merely provide a framework to the ALJ, who must

give "full individualized consideration" to the relevant facts of the claim in order to establish the existence of available jobs. *Id.* In those cases, the ALJ must prove the availability of jobs through the testimony of a vocational expert. *Id.* As a corollary to this requirement, however, the ALJ has the right to rely upon the testimony of a vocational expert as to the availability of jobs types in the national economy that can be performed by the claimant so long as the vocational expert's opinion is based upon proper hypothetical questions that fairly set out all of the claimant's severe impairments. *See Walker v. Bowen,* 889 F.2d 47 (4th Cir. 1989).

In the present case, Claimant never progressed to the fifth and final step of the process because the ALJ determined, with the assistance of a vocational expert, that Claimant was capable of performing his past relevant employment as an in-home therapist as he actually performed it and as it is generally performed in the national economy. (Tr. at 117, 161). Hence, Claimant failed to establish a *prima facie* case of disability that would have shifted the burden of going forward with the evidence to the Commissioner. As such, the Commissioner had no duty to rebut a non-existent "presumption." Accordingly, the undersigned **FINDS** that this challenge lacks both a factual and legal foundation.

## VIII.  Recommendations for Disposition

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF No. 12); **GRANT** the Commissioner's request for judgment on the pleadings, (ECF No. 13); **AFFIRM** the decision of the Commissioner; **DISMISS** this action, with prejudice, and remove it from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if mailed) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown. Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Thomas v. Arn*, 474 U.S. 140 (1985); *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Chambers, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED**:  January 18, 2017

Cheryl A. Eifert
United States Magistrate Judge

34